UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re:   Michael B. White and
         Darla Kay White,

                 Debtors,


MICHAEL B. WHITE, and
DARLA KAY WHITE,

                 Appellants,                      Case No. 14-cv-14599

v.                                                Honorable Thomas L. Ludington

DANIEL M. MCDERMOTT, United States Trustee,
FRANKENMUTH CREDIT UNION,
ALLY FINANCIAL, INC.,

                 Appellees.
_____/

**OPINION AND ORDER AFFIRMING BANKRUPTCY COURT**

Appellants Michael and Darla White appeal a decision of the Bankruptcy Court for the Eastern District of Michigan. The bankruptcy case was initiated on July 30, 2013 when the Whites sought the protection of Chapter 11 of the bankruptcy code. After proposing two plans of reorganization, both of which were rejected by the bankruptcy court, Judge Opperman determined that the case should be converted to a proceeding under Chapter 7 of the bankruptcy code and the automatic stay on the sale of the White's assets, namely their house and car, should be lifted. The Whites now appeal that ruling.

**I.**

Michael and Darla White were a husband and wife who resided in Birch Run, Michigan.[1] Michael White has worked in the fields of construction and sand mining. Darla White worked for a number of years in the insurance and trucking industries. The Whites' careers changed significantly in 2007 when Darla White began suffering from a disability. She was no longer able to work and Michael, facing his own issues with employment, took time to care for her. Darla's health never recovered after 2007 and she was unable to return to work. Eventually Michael found steady employment in the meat market at a local Meijer's, where he still works.

### A.

The Whites purchased their primary residence at 11085 Block Road, Birch Run, Michigan ("Block Road property"), in 1990. The homestead consists of 40 acres of farmland and a farmhouse where the Whites reside. They paid the mortgage loan for the house in full in 2006. In 2007, the White sought a line of credit from Frankenmuth Credit Union ("FCU"). Their credit request was approved and they secured a $100,000.00 loan from FCU that was secured by a mortgage against the Block Road property. The loan money was withdrawn using a credit card issued to the Whites.

The Whites withdrew the full amount of the loan within eighteen months of the account being opened. By 2010, the Whites began to fall behind on their loan payments. They stopped making payments altogether in 2011. In response, FCU initiated a foreclosure action in Saginaw County Circuit Court. The Whites defended the action, contending that FCU's mortgage was invalid, but were unsuccessful. The Saginaw County Circuit Court entered a judgment of foreclosure in favor of FCU on July 15, 2011. FCU was authorized to hold a foreclosure sale after August 5, 2011 and to recover $113,789.23 in costs and fees.

---

[1] Darla White passed away after appeal was taken in this case.

**B.**

On July 30, 2015, before FCU conducted a foreclosure sale, the Whites filed for bankruptcy and the automatic stay barred the foreclosure sale. As part of the Chapter 11 bankruptcy proceeding, the Whites were required to provide monthly operating reports to the bankruptcy court. Those reports were timely filed each month until the case was converted to a Chapter 7 proceeding.

**C.**

During the roughly one year that the Whites were in bankruptcy they reported a negative cash flow in their monthly operating reports more often than not. Indeed, seven of the twelve reports reflected a deficit. These reports also did not make any mention of the mortgage payments. The Whites also did not consistently service their car loan while in bankruptcy, evidenced by the fact that only some of their monthly operating reports show payments on that loan.

In addition to filing monthly operating reports, the Whites had to file a schedule of their assets. This was filed in their initial petition, but was also included in the monthly reports. While the asset schedules initially reflected significant assets relative to their debt, the Whites reduced the value assigned to their assets during the bankruptcy proceeding. Between April and May 2014, the Whites reduced the estimated asset value of their Block Road property from $360,000.00 to $170,000.00 and their WCI[2] stock from $240,000.00 to $20,520.00.

The Whites proposed two plans of reorganization. The first came ten months into the bankruptcy. All significant parties in interest objected to confirmation of the plan, including FCU, Ally Financial (holder of the Whites' car loan), and the United States Trustee. The plan's

---

[2] This is the acronym representing the Whites' personal incorporated entity. They use this entity to sell items on Amazon, amongst other things.

defining feature was a reduction of the amount owed by the Whites to FCU under the loan secured by their residence. At the time the first plan was proposed, FCU was owed $158,401.60 but the Whites proposed reducing that amount to $70,000.00, $30,000.00 of which would come from a Michigan state program set up to help those hardest hit by the mortgage crisis and only $40,000.00 would be paid by the Whites. The Whites also proposed that the $40,000.00 be paid over 25 years. The plan was not confirmed and the Whites were given 28 days to propose a new plan.

Shortly after the Whites proposed their first plan, the United States Trustee moved to have their case dismissed or converted to a Chapter 7 proceeding. FCU and Ally also moved to have the automatic stay lifted, allowing FCU to continue the foreclosure.

**D.**

The Whites filed their second plan of reorganization on August 21, 2014. A hearing was held the next day on the plan, the United States Trustee's motion to dismiss or convert, and the creditors' motion to lift the automatic stay. As with the first plan, the Whites' second plan attempted to reduce the amount actually owed to FCU, this time claiming that, if they owed anything, it "should not exceed $76,556.70." R. at 340. With this new plan, the Whites still proposed that FCU receive $30,000.00 in state funds, but increased the amount they would pay to $45,000.00, this time amortized over 40 years. The plan included a number of contingencies and liquidated payments to be made to them by the creditors, particularly FCU, pending the results of collateral proceedings unrelated to the bankruptcy. R. at 320. These included FCU agreeing, by confirming the plan, to paying the "Whites $175,000.00 for liquidated damages related to their loss of credit rating, pain & suffering, and related issues, in addition to any direct damages" if the Whites prevailed over FCU in their state court appeal. *Id*. The Whites also

inserted a condition that FCU would pay them $250,000.00 if the Whites lost their home to foreclosure but prevailed in the state court appeal. *Id*. Lastly, the Whites also required those payments to be made by FCU if "a government regulator deems the credit union to have committed any errors or wrongdoing in this matter" even if the Whites do not prevail in their state court appeal. *Id*.

The bankruptcy court declined to affirm the Whites plan and granted the motion to convert, converting the proceeding to a Chapter 7 bankruptcy, and lifted the stay imposed upon property securing the FCU and Ally loans. The Whites appealed to this Court.

**II.**

Final orders of a bankruptcy court are appealable to a federal district court under 28 U.S.C. § 158(a). *In re Gourlay*, 496 B.R. 857, 859 (E.D. Mich. 2013). "Th[is] Court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo." *Id*. (citing *AMC Mortg. Co. v. Tenn. Dep't of Revenue (In re AMC Mortg. Co.)*, 213 F.3d 917, 920 (6th Cir.2000)).

**III.**

The Whites appeal two rulings made by the Bankruptcy Court with respect to their Chapter 11 proceedings. First, they challenge the decision to convert the proceeding to a Chapter 7 bankruptcy. Second, they challenge the decision to lift the stay on FCU's foreclosure of their residence. Neither of the challenges have merit. The Whites' appeal will be denied.

**A.**

The Whites first challenge the decision to convert the nature of the bankruptcy proceeding from Chapter 11 to Chapter 7. That decision was made following a motion by the United States Trustee to dismiss or convert the case.

Chapter 11 U.S.C. § 1112 governs the conversion of Chapter 11 bankruptcy proceedings. Specifically, subsection (b)(1) states that: ". . . on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1112(b)(1). Subsection (b)(4) provides a list of what qualifies as "cause" for purposes of conversion or dismissal of a Chapter 11 bankruptcy case. Subsection (b)(4) lists sixteen different scenarios that constitute "cause", but only two, subsections (b)(4)(A)&(M), are relevant to the Whites. Subsection (b)(4)(A) defines "cause" as "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]" 11 U.S.C. § 1112(b)(4)(A).

When deciding to convert the Whites' case to a Chapter 7 proceeding, Judge Opperman determined that the Whites' were experiencing continuing losses and did not have a reasonable likelihood of rehabilitation. He also concluded that the Whites were unable to develop a conforming plan. The Whites challenge that determination.

**1.**

The Whites first argue that Judge Opperman incorrectly concluded that they were suffering from a substantial or continuing loss. To prove cause for conversion under Chapter 11, "the moving party must demonstrate that there is both a (1) [substantial or] continuing loss to or diminution of estate assets and (2) an absence of a reasonable likelihood of rehabilitation." *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013) (quoting *In re Westgate Props., Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010)) (internal quotation marks omitted). "To satisfy the first prong, a movant may demonstrate "that the debtor continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief" or that the

debtor's assets have declined in value since the case was commenced." *Id*. (internal quotation marks omitted). The Sixth Circuit noted that a loss need not be substantial and continuing. Only one of the two is necessary. *Id*. Furthermore, a negative cash flow suffices to establish a continuing loss. *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515-16 (8th Cir. 2004).

As for rehabilitation (the second prong), "a movant must demonstrate that the debtor does not have a reasonable likelihood of rehabilitation." *Id*. Rehabilitation requires something "much more demanding . . . than 'reorganization.'" *Id*. (quoting *In re Brutsche*, 476 B.R. 298, 301 (Bankr. D.N.M. 2012)) (internal quotation marks omitted). The Sixth Circuit explained a reasonable likelihood of rehabilitation as the possibility of "the debtor, or some other party, . . . stem[ing] the debtor's losses and plac[ing] the debtor's enterprise back on a solid financial footing within a reasonable amount of time[.]" *Id*. (quoting *In re Costa Bonita Beach Resort, Inc.*, 479 B.R. 14, 42 (Bankr. D.P.R. 2012) (internal quotation marks omitted).

The Whites do not explain on appeal how their estate was not suffering from continuing diminution. They similarly made no such proofs before the bankruptcy court. Instead, the Whites state conclusorily that their financial situation is thriving and that the continued and repeated negative cash flow reflected in their monthly operating reports is merely an accounting quirk. According to the Whites, the fact that they used the cash method of accounting instead of the accrual method of accounting explains the negative cash flow. If the accrual method of accounting were used, they argue, their financial situation would look far healthier.

This explanation is unpersuasive. The Whites do not explain what revenues they have an accrued right to receive where the cash proceeds have yet to be actually received. Only by showing such transactions would they benefit from the accrual method of accounting as opposed to the cash method. The Whites argue that the accrual method would allow them to credit

speculative future income, such as the value associated with the right to remove gravel from a lot or the value of possible future legal judgments. These items were at best speculative income and thus the Whites' situation would be no better if accrual accounting were applied.

That leaves the monthly operating reports that were presented to the bankruptcy court. As those reports demonstrate, the Whites were not paying their monthly liabilities. For seven of the twelve months they were in bankruptcy, the Whites operated at a loss. As the United States Trustee emphasizes, these negative figures actually understate the Whites' financial circumstance. The Whites did not make a payment on their home mortgage during any month of the bankruptcy proceeding, let alone the months where they noted an operating loss.[3] The Whites also made only periodic payments on the debt owed under their automobile loan. Thus, even assuming the Whites did not need to service two of their most substantial debts, they were still operating at a loss. Judge Opperman did not err in determining that the Whites' were suffering a continuing loss.

**2.**

Facing a continuing loss is alone not fatal to the Whites' hopes of completing a Chapter 11 bankruptcy unless their estate also faces no reasonable probability of rehabilitation—the second prong of the continuing or substantial loss analysis. The Sixth Circuit explained in *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51 (B.A.P. 6th Cir. 2013), that debtors are not afforded "an unlimited amount of time to confirm a plan or an unlimited number of attempts at plan confirmation[.]" *Id*. at 61. For that reason, a debtor does not have a "reasonable likelihood of rehabilitation" if "the debtor's plan of reorganization lacks a 'reasonable possibility of being confirmed within a reasonable time.'" *Id*. (quoting *Loop Corp.,* 379 F.3d at 516). There is no

---

[3] The Whites maintain that they do not owe any money on this mortgage, which perhaps explains why they have chosen not to make any payments on the mortgage.

bright line rule as to what amount of time is a reasonable amount for a debtor to confirm a plan. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 162 (3d Cir. 2012) (citing conversions that occurred after three months as reasonable).

The Whites argue that they were not given a reasonable amount of time to confirm a plan because they were only permitted two proposals. They believe this to be unjust because in *Creekside*, 489 B.R. 51, the debtors were permitted to file four plans. But Creekside does not support the notion that the Whites were entitled to more bites at the apple. Rather, where a debtor's proposals do not show an improved likelihood of confirmation, the law favors conversion or dismissal rather than more attempts at confirmation. That is because "repeatedly unsuccessful attempts at confirmation are likely to generate enormous administrative costs, often without increasing the likelihood of success[.]" *In re Am. Capital Equip., LLC*, 688 F.3d at 162-63 (quoting *In re Rand,* No. AZ–10–1160, No. 07–06801, 2010 WL 6259960, at *5 (9th Cir. BAP Dec. 7, 2010)) (internal quotation marks omitted).

Here, the Whites did not propose their first plan until ten months after first filing for bankruptcy. After that plan was rejected it took another three months to propose a new plan. Such a delay is not offensive in and of itself, but the second plan was materially the same as the first, despite the Whites' debt continuing to mount and them not making any servicing payments on those liabilities. The Whites argue that Judge Opperman's decision to convert their bankruptcy on the same day that their second plan was heard was unfair. But the Whites' first plan was substantively unreasonable and their second plan made no greater progress. For example, the Whites proposed reducing the liability on their foreclosed mortgage from over $150,000.00 to $75,000.00. This, in spite of the fact that Chapter 11 plans may not "modify the

rights of holders of secured claims . . . secured only by a security interest in real property that is the debtor's principal residence[.]" 11 U.S.C. § 1123(b)(5).

The Whites argue that not all of their Block Road property qualifies as a principal residence, but none of their arguments are persuasive. The bankruptcy code defines a "debtor's principal residence" as "a residential structure if used as the principal residence by the debtor, including incidental property[.]" 11 U.S.C. § 101(13A)(A). The Whites somehow interpret the inclusion of the "incidental property" language as permission to separate their acreage into two buckets: principal residence and incidental property. The bankruptcy code authorizes no such treatment. The Code further defines "incidental property" as, "with respect to a debtor's principal residence[,] . . . property commonly conveyed with a principal residence in the area where the real property is located[.]" 11 U.S.C. § 101(27B)(A). Thus, the Code is clear in two separate sections that there is no authority for separating a parcel of land that constitutes a principal residence.

The Whites' attempts to modify the amount owed on their mortgage are not permitted by the Code. To the extent a modification of the Whites' mortgage liability was integral to their possibility of rehabilitation, their plan could not be reasonably effectuated.

But the Whites not only argue that their mortgage liability should be reduced. They also argue that the mortgage itself is invalid. These arguments were presented to the Bankruptcy Court in the Whites' objection to Frankenmuth Credit Union's proof of claim. The Bankruptcy Court rejected Whites' arguments that the mortgage was invalid on the basis of the *Rooker-Feldman* doctrine. The Whites' challenge that ruling on appeal. They argue that "[p]reclusion in [the] bankruptcy court would violate [their] right to due process under the U.S. Constitution." ECF No. 5 at 19.

This claim falls squarely within the *Rooker-Feldman* doctrine. Indeed, the Whites' claim, as they formulate it, seeks the exact kind of relief the doctrine prohibits. The *Rooker-Feldman* doctrine "prevent[s] a party losing in state court . . . from seeking what in substance would be appellate review of the state judgment [in the lower federal courts] based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Pieper v. Am. Arbitration Ass'n, Inc.*, 336 F.3d 458, 460 (6th Cir. 2003) (quoting *Tropf v. Fid. Nat. Title Ins. Co.*, 289 F.3d 929, 936-37 (6th Cir. 2002)) (second alteration in original). The doctrine also "bars relitigation of claims raised in state-court proceedings as well as claims that are "inextricably intertwined" with the claims asserted there." *Id*. So the Whites assertion that federal law[4] requires a ruling that their mortgage with FCU is invalid would be no more than an attempt at relitigating the issues they raised in the Saginaw Circuit Court. Judge Borchard of the Saginaw Circuit Court issued a judgment of foreclosure after determining that FCU did indeed hold a valid mortgage. Litigating that mortgage's validity would be a collateral attack on that ruling in the form of a federal appeal, something that is explicitly barred by *Rooker-Feldman*.

The Whites attempt to salvage this claim by asserting that the *Rooker-Feldman* doctrine does not apply until the final appeal is taken in the state action. That is not the law of this circuit. The Sixth Circuit has rejected the argument that *Rooker-Feldman* only applies to state actions that have exhausted all appeals and "join[ed] with the majority of circuits that have concluded that the *Rooker–Feldman* doctrine does apply to interlocutory orders and to orders of lower state courts." *Pieper*, 336 F.3d 462. Thus, the fact that the Whites are still pursuing an appeal of the state court ruling where it was determined that FCU holds a valid mortgage is irrelevant to the applicability of the *Rooker-Feldman* doctrine.

---

[4] Though the Whites notably do not identify the specific provisions of federal law that would invalidate their mortgage.

- 11 -

**B.**

The Whites also challenge the decision of the bankruptcy court to lift the stay on the sale of their assets that were subject to secured credit interests. The lifting of an automatic bankruptcy stay is governed by 11 U.S.C. § 362(d). That subsection reads:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest

11 U.S.C. § 362(d)(1). Relief from a stay under the cause standard in 11 U.S.C. §362(d)(1) is governed by the same standard for conversion under 11 U.S.C. § 1112(b)(4)(A) where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *See In re 51-53 W. 129th St. HDFC, Inc.*, 475 B.R. 391, 399 (Bankr. S.D.N.Y. 2012); *see also In re Creekside*, 489 B.R. at 62 (recognizing the interrelationship between the lifting of a stay and the conversion of a bankruptcy filing). Because the Whites cannot show any error in the bankruptcy court's decision to convert their bankruptcy to a Chapter 7 proceeding, they likewise cannot show that the bankruptcy court erred in lifting the automatic stay imposed in their case.

**C.**

The last form of relief the Whites seek relates to Ally Financial's proof of claim before the bankruptcy court. According to the Whites, Ally Financial did not comply with Federal Rule of Bankruptcy Procedure 3001 concerning proofs of claim. Rule 3001(c)(2)(A) requires that in a case where the debtor is an individual "[i]f in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized

statement of the interest, fees, expenses, or charges shall be filed with the proof of claim." The Whites allege that they did not receive an itemization statement from Ally Financial.[5]

This claim is contradicted by the record. The Whites admitted in their objection to Ally's proof of claim that they received accountings of their debt up until they filed their bankruptcy petition on July 30, 2013. *See* R. 300-01. They only claimed in that objection that they stopped receiving accountings after their petition was filed. But Rule 3001(a)(2)(A) only requires an itemized statement of "interest, fees, expenses, or other charges incurred before the petition was filed[.]" Ally contended in their response to the Whites' objection that they provided an itemization of the principal owed on the car loan and the arrearages owed. The Whites do not allege that this was not provided with Ally's proof of claim. Instead, the Whites seek an itemization of each payment made against the debt prior to the claim being filed. Rule 3001 does not require such exactitude. The Bankruptcy Court's ruling is affirmed on this ground.

## IV.

Accordingly, it is **ORDERED** that the judgment of the bankruptcy court is **AFFIRMED**.

Dated: July 31, 2015                        s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 31, 2015.

s/Karri Sandusky
Karri Sandusky, Acting Case Manager

---

[5] Ally Financial did not file an Appellee Brief in response to the Whites' appeal, a practice that is not encouraged.